FILED
2012 Sep-28  PM 05:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| CHARLES E. BUTTERWORTH, JR. | ) | |
| Family Trust by Joyce Butterworth- | ) | |
| Engler, Trustee, JOYCE BUTTERWORTH- | ) | |
| ENGLER, WILEY L. ESTES, T.J. KASSOUF, | ) | |
| MARY JO KASSOUF, SHIRLEY A. KELCE, | ) | |
| KIMBERLY GLASGOW, MARY K. LEWIS, | ) | |
| ELLEN DAVIES ROGERS, DARCIE A. | ) | |
| SIMMONS, BONNIE FAE SPARKS- | ) | |
| MITCHELL, | ) | Case No. 2:12-cv-00337-TMP |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| MORGAN KEEGAN & COMPANY, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION**

This case is before the court on two interrelated matters: (1) plaintiffs' application to confirm an arbitration award pursuant to 9 U.S.C. § 9 (doc. 1), and (2) the defendant Morgan Keegan & Company, Inc.'s motion to vacate the arbitration award that plaintiffs seek to confirm. (Doc. 3). The parties have filed briefs and evidentiary materials in support of their respective positions and the court has considered fully the submissions of both parties, including the transcript from a two-week evidentiary hearing in the underlying proceedings. Accordingly, the plaintiffs' application to confirm the arbitration award and the defendants' motion to vacate the award are ripe for resolution.[1]

---

[1]The parties consented to magistrate judge jurisdiction under 28 U.S.C. § 636(c).

## BACKGROUND AND PROCEDURAL HISTORY

This is a case that resembles a number of other actions that have been filed across the country against defendant Morgan Keegan regarding certain investment funds (referred to collectively as the "RMK Funds") that it marketed and sold over the course of several years beginning as early as 1999. The collapse of the funds spawned nationwide litigation alleging the impropriety of the funds being invested in the risky, "lower tranches"[2] of asset-backed securities. Lawsuits of this genre typically allege that the collapse of the funds was not attributable to market downturn or even the financial crisis of 2007-2008, as evidenced, plaintiffs allege, by the fact that the "tremendous losses" of the RMK funds were not suffered by other "comparable" bond funds during the same period of time.[3] How the funds operated and why the funds collapsed involves expertise and an explanation of structured finance, complex investment models, and fluency in financial acronyms.[4] Such expertise

---

[2]"'Tranche' is the French world for 'slice.' In the field of investments, tranche refers to a security that its sellers split into smaller pieces to be sold to investors. Where the security is an asset-backed security, like those at issue here, each tranche has different rules for paying its investors. The "top" tranche contains the safest securities, and its investors receive principal and income payments first. The lowest tranche contains the riskiest securities. Its investors receive payment only if all investors in the higher tranches are paid first. Thus, if borrowers default on the assets backing the securities, those who have invested in the lowest tranches bear any losses first." In re Regions Morgan Keegan Sec., Derivative, & Erisa Litig., 743 F. Supp. 2d 744, 752 (W.D. Tenn. 2010) reconsideration denied, 07-2784, 2010 WL 5464792 (W.D. Tenn. Dec. 30, 2010), citing Consulting Serv. Group, LLC v. Morgan Keegan & Co., Nos. 10–02045, MDL 2009, 2010 WL 2650736, at *1 n. 2, 2010 U.S. Dist. LEXIS 66917, at *4 n. 2 (W.D. Tenn. July 2, 2010).

[3]Regarding "comparable" funds, the court notes that plaintiffs allege that the RMK funds were marketed as "high yield bond funds" despite the fact that the funds were not true high yield bonds. The RMK funds, plaintiffs allege, were subject to "spectacular losses" because they were invested in the aforementioned "low-priority tranches of structured finance deals." True high-yield bonds, plaintiffs allege, did not experience the losses that the RMK funds experienced during the same period of time.

[4]By way of example, a sampling of relevant acronyms includes ABS (asset-backed securities), CBOs (collateralized bond obligations), CLOs (collateralized loan obligations), CMOs

and explanation was offered at the underlying arbitration and considered by the court in its review of the transcript from the proceedings.  For purposes of this matter, however, where this court must either confirm or vacate the arbitration award, the intricacies of structured finance need not be parlayed, debated, or otherwise conveyed beyond mention.  Here, it is sufficient to note that the funds at issue in the underlying arbitration were allegedly invested, unbeknownst to the plaintiffs, in high-risk sectors that resulted in the funds losing allegedly more than 90% of their value.

On or around August 27, 2010, plaintiffs filed with the Financial Industry Regulatory Authority ("FINRA") a Statement of Claim against defendant Morgan Keegan that commenced the underlying arbitration.[5]  The Statement of Claim asserts several causes of action including breach of fiduciary duty, breach of contract, unsuitability, failure to supervise, violations of securities regulatory rules, violations of the Alabama Securities Act, intentional and negligent misrepresentation, unjust enrichment, breach of duty of good faith and fair dealing, gross negligence, and reckless disregard.  In support of these claims, plaintiffs make a number of factual allegations that include the following:

• All of the Claimants herein, with the exception of Mark K. Lewis, James W. Nabors and Wilma H. Nabors, Darcie A. Simmons, and Bonnie Fae Sparks-Mitchell were sold the RMK

---

(collateralized mortgage obligations), and CDOs (collateralized debt obligations).

[5]According to its website, www.finra.org, "FINRA is the largest independent regulator for all securities firms doing business in the United States."  The FINRA website further provides that it "operates the largest dispute resolution forum in the securities industry to assist in the resolution of monetary and business disputes between and among investors, brokerage firms and individual brokers."  An investor must arbitrate at FINRA if the arbitration is required by written agreement and the dispute involves the securities business of the broker and/or brokerage firm.  There is no dispute here that Morgan Keegan is a FINRA member.

funds through the Morgan Keegan Branch office located at 2900 Highway 280, Suite 100, Birmingham, Alabama.[6]

- The claimants fully relied on Morgan Keegan to oversee their investments and to provide them with sound investment strategies. Morgan Keegan represented to the Claimants that these Funds were relatively safe and conservative investments that would protect their investment principal and provide income. The claimants trusted Morgan Keegan to make a suitable recommendation.

- Morgan Keegan misrepresented or failed to disclose material facts relating to the funds including, but not limited to:

  (1)     Failure to disclose the true speculative nature of the securities;

  (2)     Failure to disclose the nature of the risk of investment in the funds;

  (3)     Failure to disclose that the funds were not typical bond funds;

  (4)     Failure to disclose the illiquidity of the underlying securities held by the funds;

  (5)     Failure to disclose the extent of the funds' vulnerability to lack of marketability;

  (6)     Failure to disclose the extent to which the value of the funds was based on mere estimates of value and the uncertainty inherent in such estimated values;

  (7)     Failure to disclose that investors would be exposed to extraordinary credit risk;

  (8)     Failure to adequately disclose the imminent risks of default associated with the portfolio assets as Morgan Keegan became aware of the risks;

  (9)     Failure to disclose the concentration of investments in a single industry;

  (10)    Failure to disclose that the fund's assets were concentrated in the lowest-priority tranches of asset-backed securities, CDOs, CMOs, and CLOs and derivative investments;

  (11)    Failure to disclose that an investment in the lowest-priority, highest-risk tranches of asset-backed and mortgage-backed securities carries extraordinary risk compared to

---

[6]Mark K. Lewis is alleged to have procured the subject funds through a Morgan Keegan Financial Advisor in Memphis, Tennessee. James W. Nabors and Wilma Nabors, Darcie A. Simmons, and Bonnie Fae Sparks-Mitchell all are alleged to have procured the funds from a Morgan Keegan Financial Advisor in Pelham, Alabama.

the average interest rate risk, prepayment risk, and credit risk of the underlying assets;

(12)     Failure to disclose that the credit ratings reported do not incorporate the risks associated with the low priority tranches of the CDOs that dominated the funds' portfolios;

(13)     Failure to disclose that the consistent dividend return of the funds was a result of fraudulently smoothing the valuation of the portfolio holdings; and

(14)     Failure to disclose that the Lehman Brothers Ba Fund was not a proper benchmark for the RMK Funds.

•     Given these misrepresentations and omissions, there is simply no way that the Claimants could have foreseen the risks and subsequent losses to their accounts.  As a result of the fraudulent disclosures or lack of disclosures, the Claimants did not understand what they were investing in, or the true risks.

•     The claimants were customers of Morgan Keegan, and were simply looking for advice from Morgan Keegan on how best to invest their money.  Morgan Keegan lied to the Claimants and failed to explain to them the nature of their investments.

(Doc. 3-1, Exh. A).

Before commencing the actual evidentiary hearing in the underlying arbitration, both parties filed pre-hearing motions with the FINRA panel including a motion to sever, where the defendant argued that the arbitration should be severed into "seven separate arbitration proceedings" because "each Claimants' case requires the Panel to focus on the relationship between the Claimant and financial advisor."  (Doc. 8-12, Exh. B, p. 2).  The motion to sever was denied by the arbitration panel at a pre-hearing conference and the arbitration proceeded as it was originally filed.  (Doc. 8-13, Exh. C).  Prior to the evidentiary hearing, the defendant moved *in limine* also to preclude the plaintiffs from presenting evidence of certain regulatory matters and the alleged mismanagement of the RMK Funds.  (Doc. 8-14, Exh. D).  The panel deferred ruling on the motion until the final, arbitration hearing.  (Doc. 3-7, p. 4).  Morgan Keegan did not pursue this motion *in limine* at the

underlying arbitration and, consequently, the "Panel deemed the motion moot." (Doc. 3-7, p. 4). The arbitration took place in Birmingham, Alabama, over the course of two weeks in January 2012, and was conducted by a FINRA arbitration panel. After the evidentiary hearing was concluded, and after the panel considered the pleadings, testimony, and evidence presented at the hearing, it found that Morgan Keegan was liable and it awarded compensatory damages and attorneys fees to each individual claimant.[7]

On January 31, 2012, the plaintiffs filed with this court an application to confirm the arbitration award. (Doc. 1). The defendant filed a motion to vacate the arbitration award on February 29, 2012, and thereafter moved for an extension of time to file an amended brief in support of its motion to vacate. (Docs. 3, 6). The extension was granted and the amended brief was filed on April 30, 2012. The plaintiffs have filed a response to the motion to vacate and, on June 8, 2012, filed supplemental case authority in support of their application to confirm the arbitration award. (Docs. 8, 9). On August 7, 2012, the court entered an order advising that both the application to confirm the arbitration award and the motion to vacate the arbitration award were being taken under submission. (Doc. 10).

**DISCUSSION**

The disposition of this case is straightforward. The plaintiffs seek confirmation of an arbitration award that was rendered in their favor by a FINRA arbitration panel after a two-week

---

[7]The compensatory awards were as follows: Butterworth, Jr. Family Trust: $52,769.00; Butterworth-Engler: $52,167.00; Estes: $18,468.00; T.J. and M. Kassouf: $27,584.00; Kelce and Glasgow, Jt. Tenants: $18,020.00; Kelce: $149,095.00; Lewis: $16,523.00; Rogers:$77,586.00; Simmons: $11,280.00; Sparks-Mitchell: $27,427.00. The panel denied pre-judgment interest on these amounts.

evidentiary hearing.  The defendant, Morgan Keegan, opposes confirmation and has moved the court to vacate the award, primarily, on grounds that the arbitrators exceeded their powers under 9 U.S.C. § 10(a)(4).  Plaintiffs assert that section 9 of the Federal Arbitration Act ("FAA") provides the authority, indeed the mandate, to  confirm their award, while the defendant relies on section 10 of the FAA to persuade the court otherwise -- that this is a case where vacatur is warranted.  While both parties argue that they have a statutory foothold to buttress their respective positions, the defendant's challenge is more daunting.  This is due, in no small measure, to the fact that "[t]here is a presumption under the FAA that arbitration awards will be confirmed, and 'federal courts should defer to an arbitrator's decision whenever possible.'"  Frazier v. CitiFinancial Corp., LLC, 604 F.3d 1313, 1321 (11th Cir. 2010), citing  B.L. Harbert Int'l, LLC v. Hercules Steel Co., 441 F.3d 905, 909 (11th Cir. 2006); see also AIG Baker Sterling Heights, LLC v. American Multi-Cinema, Inc., 508 F.3d 995, 1001 (11th Cir. 2007) ("Because arbitration is an alternative to litigation, judicial review of arbitration decisions is "'among the narrowest known to the law.'" (citations omitted); Gianelli Money Purchase Plan & Trust v. ADM Investor Servs. Inc., 146 F.3d 1309, 1311 (11th Cir. 1998) ( "The Federal Arbitration Act ('FAA') provides that a federal district court can vacate an arbitration award, but only in extremely narrow circumstances."

Section 9 of the FAA governs the confirmation of arbitration awards by federal courts and that provision states, in part:

> If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is

7

vacated, modified, or corrected as prescribed in sections 10 and 11 of
this title. If no court is specified in the agreement of the parties, then
such application may be made to the United States court in and for
the district within which such award was made.

9 U.S.C. § 9.[8]  Plaintiffs contend that this statute mandates confirmation of their award because there

are no grounds that warrant the award being vacated, modified, or corrected; additionally, they

contend that arbitration of their disputes with Morgan Keegan was required by agreement.  (Doc. 1,

p. 3).  On the other hand, the defendant argues that vacatur is warranted under § 10 of the FAA,

which permits vacatur only in four limited circumstances:

> (1) where the award was procured by corruption, fraud, or
> undue means;
>
> (2) where there was evident partiality or corruption in the arbitrators,
> or either of them;
>
> (3) where the arbitrators were guilty of misconduct in refusing to
> postpone the hearing, upon sufficient cause shown, or in refusing to
> hear evidence pertinent and material to the controversy; or of any
> other misbehavior by which the rights of any party have been
> prejudiced; or
>
> (4) where the arbitrators exceeded their powers, or so imperfectly
> executed them that a mutual, final, and definite award upon the
> subject matter submitted was not made.

9 U.S.C. § 10(a).  Here, the defendant maintains that the arbitrators exceeded their powers and that

vacatur is warranted therefore under §10(a)(4) of the FAA.  Again, the difficulty for the defendant

---

[8]It should be noted that plaintiffs' application to confirm the arbitration award was filed the
day after the award was entered by the panel and is, therefore, indisputably timely.

is not only convincing the court that the arbitrators did, in fact, exceed their powers, but also persuading the court that there is enough evidence of excessive power to overcome the well-settled presumption that arbitration awards will be confirmed.  Put simply, the defendant's burden is heavy and "judicial review of the arbitration process and of the amount of the award is narrowly limited." Booth v. Hume Pub., Inc., 902 F.2d 925, 932 (11th Cir. 1990) (internal citations omitted).[9]  It is against the backdrop of a statutorily-circumscribed, limited, and narrow review that the court undertakes consideration of the subject arbitration award and, in turn, the defendant's argument that the "arbitrators clearly exceeded their powers in rendering the award."  (Doc. 8).

The main contention offered by the defendant as grounds for vacating the arbitration award is that the arbitrators exceeded their powers because they considered, in violation of an internal FINRA rule, derivative claims.  The defendant argues also that the panel exceeded its powers by hearing claims of certain plaintiffs who failed to comply with FINRA discovery rules and that the award should be vacated because the arbitrators made an alleged mistake in calculating one of the individual awards; but, these arguments are ancillary to the defendant's main contention that the subject claims are derivative in nature and should not have been arbitrated under FINRA rules.

### Non-Member/Derivative Claim Argument

The crux of the defendant's motion to vacate concerns the application of FINRA rules to the underlying dispute and the alleged violation of those rules as grounds for vacating an arbitration award under § 10(a)(4) of the FAA.  Principally, the defendant's argument implicates the substance of the plaintiffs' claims and whether those claims are derivative in nature.  Tucked into the argument

---

[9]"Moreover, the district court need not conduct a full hearing on a motion to vacate or confirm; such motions may be decided on the papers without oral testimony."  Booth v. Hume Pub., Inc., 902 F.2d 925, 932 (11th Cir. 1990), citing  Legion Insurance Co. v. Insurance General Agency, Inc., 822 F.2d 541, 543 (5th Cir.1987).

that the award should be vacated because the Panel heard derivative claims is the additional assertion that the Panel exceeded its power by hearing, and issuing an award upon, "the alleged misdeeds of nonparties and nonmembers."  Both the derivative claim argument and the non-member/non-party assertion rest on the foundational supposition that FINRA rules were incorporated into the subject arbitration agreements – a point in fact that the plaintiffs do not appear to dispute.[10]  The court construes the defendant's non-member and derivative claim arguments as raising questions regarding scope and substance.  First, did the arbitrators exceed the scope of their jurisdiction and concomitantly, their power, by allegedly hearing claims against non-members?  And, second, are the plaintiffs' claims, in substance, derivative claims that the arbitrators exceeded their power in hearing because FINRA rules prohibit arbitration of shareholder derivative actions?  The court has considered the positions of both parties regarding each question and it will address them in turn.

In the underlying arbitration, plaintiffs filed their Statement of Claim against one defendant: Morgan Keegan & Company.  The plaintiffs did not file any claims against Morgan Asset Management ("MAM"), a Morgan Keegan affiliate that allegedly managed the RMK Funds at issue, or Jim Kelsoe, the fund manager, who was the alleged architect behind the scheme to defraud investors from realizing the true risk of the subject investments.  The defendant argues that even though the plaintiffs did not sue MAM or Kelsoe, their claims were, in essence, directed against them.  Thus, from the defendant's perspective, the cause of the plaintiffs' injuries was

---

[10]The subject arbitration agreements have not been submitted for the court's review.  Because the plaintiffs do not appear to dispute that the FINRA rules apply, the court will not belabor the issue of whether the arbitration agreements incorporated FINRA rules.  It should be noted that the defendant contends that the plaintiffs signed a FINRA Arbitration Submission Agreement, a copy of which the defendant states that it will file upon receipt.  Again, because the plaintiffs do not dispute signing the Submission Agreement, the court does not find it necessary to review the document in order to complete the analysis here.

mismanagement of the RMK Funds and that occurred at the hands of non-parties MAM and Kelsoe, not Morgan Keegan, the only entity, the defendant contends, within the jurisdictional reach of the FINRA arbitration.  This argument implicates Rule 12101 which provides that the "Code applies to any dispute between a customer and a member or associated person of a member that is submitted to arbitration."  From this rule, the defendant infers that the arbitrators were not permitted to hear claims against MAM and Kelsoe because they were not FINRA members.[11]  Thus, according to the defendant, when the Panel heard evidence against MAM and Kelsoe they exceeded their power in deciding claims based on "the alleged misdeeds of nonparties and nonmembers."   While the defendant may be ultimately correct in its observation regarding the jurisdictional reach of a FINRA arbitration, the court is not convinced, for several reasons, that this is a compelling argument for vacatur of the arbitration award here.

To begin, the FINRA rule that the defendant cites, Rule 12101, includes language that the FINRA Code applies to "an associated person of a member."  Without deciding the issue, the court posits that Kelsoe, who plaintiffs allege was employed by Morgan-Keegan, and MAM, who plaintiffs allege was an affiliate of Morgan Keegan with the same parent corporation, may both fall within the intended meaning, or coverage, of the "associated person" language.  Even if the "associated person" language is not construed to include MAM or Kelsoe, however, the court is unpersuaded nevertheless  that the plaintiffs' claims in this case can be reduced to claims only against these non-parties. While it is true that evidence was presented regarding the alleged mismanagement of funds, and Kelsoe's role in that regard, plaintiffs contend, convincingly, that such evidence was presented in addition to evidence of Morgan Keegan's direct involvement in the alleged wrongdoing.  Having

---

[11]There does not appear to be any dispute that MAM and Kelsoe were not FINRA members.

reviewed the transcript of the arbitration, the court agrees that evidence was presented to implicate Morgan Keegan directly.  Indeed, all plaintiffs  maintained brokerage accounts at Morgan Keegan and testified, individually, about how they relied on representations from Morgan Keegan financial advisors in purchasing the RMK funds at issue.  The plaintiffs further testified that the Morgan Keegan brokers failed to disclose risks associated with the funds and that they suffered losses accordingly.  The court is persuaded that this evidence is enough, especially given the extremely limited review this court has at this juncture, to find that the arbitrators were within their power to hear the plaintiffs' claims – even if that means that in the course of the evidentiary hearing they heard,  in addition to the evidence against Morgan Keegan, evidence of the alleged wrongdoing of non-parties as well. Arbitrators enjoy "wide latitude in conducting an arbitration hearing" and "[a]rbitration proceedings are not constrained by formal rules of procedure or evidence," and, therefore, the admission of evidence implicating MAM and Kelsoe does not necessarily bear consequence on how the arbitrators ultimately arrived at the final award in this case.  Rosenseweig v. Morgan Stanley & Co., Inc., 494 F.3d 1328, 1333 (11th Cir. 2007).  This is especially true here, where the Panel's written order does not indicate what evidence it considered in rendering the award.

In addition to arguing that the arbitrators exceeded their power in hearing claims of non-parties beyond their jurisdictional reach, the defendant argues also that the arbitrators exceeded their power in hearing shareholder derivative claims.[12]  This argument implicates the substance or nature

_____

[12]The principal argument that the defendant puts forth as warranting a vacatur of the arbitration award in this cases implicates the breadth of the arbitrators' authority under the arbitration agreement.  Because the court does not have the arbitration agreement before it, it cannot speculate on the breadth of that authority here.  Plaintiffs have submitted, as supplemental authority, an order by Judge Robert S. Vance confirming an arbitration award in the Circuit Court of Jefferson County, Alabama.  In that case, which also involved a FINRA arbitration over losses in various Morgan Keegan bond funds, the arbitration provision applied to "any controversy or claim or issue in any controversy arising from events which occurred prior to, on or subsequent to the inception of this

of the plaintiffs' claims and rests on the prohibition of FINRA rule 12205, which states that: "[s]hareholder derivative actions may not be arbitrated under the Code." Further, the argument hinges on at least two necessary predicates: (1) that the claims asserted by the plaintiffs are derivative in nature and (2) that the violation of a FINRA "rule" constitutes excessive power as contemplated under §10 of the FAA. As to the argument that the claims are derivative in nature, the defendant maintains that the evidence presented at the arbitration consisted of misrepresentations and omissions by the fund manager (Kelsoe) directly to the shareholders, and therefore plaintiffs' claims were a "textbook derivative claim." The defendant points to instances in the underlying arbitration where plaintiffs conceded that the brokers did not intentionally deceive the plaintiffs, rather they (the brokers) were duped as well by the "nondisclosure" of information from Kelsoe, the fund manager. Also, the defendant points out that in closing argument plaintiffs' counsel stated that "the most important person in this case is not in this room, and his name is Jim Kelsoe." (Doc. 8, p. 7, citing Butterworth Trans. at 2774:14 to 2776:15). Essentially, the defendant argues, plaintiffs' case and chief complaint is about the mismanagement of the RMK funds and mismanagement claims are necessarily derivative.

As mentioned above, it is true that plaintiffs put on evidence in the underlying arbitration that implicated the management of the RMK funds. Likewise, it is true that plaintiffs did not sue the individual brokers in this litigation. On the other hand, it is true also that individual plaintiffs

---

arbitration agreement." (Doc. 9-2, p. 6). Judge Vance concluded that the "scope of the arbitration obligation arising from this language is very broad, essentially covering any dispute between the parties," and this court agrees with his assessment. (Doc. 9-2, p. 6). Obviously, without the benefit of reviewing the arbitration agreement, the court cannot assess what authority the arbitrators were given under the contract. To the extent the provisions prove similar, however, the court notes that it would likely conclude, as Judge Vance did, that the "arbitrator cannot be said to have exceeded his [broad] authority in deciding the claim put forward [by the plaintiff]." (Doc. 9-2, p. 6).

testified at the evidentiary hearing about the alleged fraud that was perpetrated upon them by being misled into investing in funds that were totally unsuitable for their investment objectives.   For example, plaintiff Rogers testified that she was never told the RMK funds were risky and that she was told it was a conservative investment.  (Doc. 8-2, p. 387).   Similarly, plaintiff Kassouf testified that he told his broker he wanted to invest in something "safe."   (Doc. 8-2, p. 460).   Plaintiff Simmons testified that she was certain her broker did not disclose the true risk of the fund and that she was never told that the fund would be very aggressive.  (Doc. 8-3, pp. 718, 726).   Plaintiff Sparks-Mitchell testified that she thought, based on representations made to her, the subject funds would have risk similar to a Certificate of Deposit (CD).  (Doc. 8-3, pp. 793).   Moreover, the statement of the claim alleges:

> The claimants fully relied on Morgan Keegan to oversee their investments and to provide them with sound investment strategies. Morgan Keegan represented to the Claimants that these Funds were relatively safe and conservative investments that would protect their investment principal and provide income.  The Claimants trusted Morgan Keegan to make a suitable recommendation.
>
> In making their decision to purchase the Funds, Claimants relied solely on Morgan Keegan's advice and recommendations.  However, the reality of these funds did not match Respondent's representation. As a result of the Respondent's recommendation, the Claimants have suffered extraordinary losses to their accounts.

(Doc. 3-1, p. 10).

The court is not persuaded that plaintiffs' claims can be reduced to general dissatisfaction about the management of the RMK Funds when both the claims and testimony purport to allege personal wrongdoings to individual plaintiffs.  While the transcript of the underlying arbitration

does, as the defendant contends, bear witness to plaintiffs' position that the alleged fraud "emanated from Kelsoe himself," the record substantiates also distinct claims of fraud and misrepresentation on behalf of each individual plaintiff, most notably, in the form of individual plaintiffs testifying about the representations that were made to them in advance of purchasing the subject funds.  Thus, to the extent that fund mismanagement was a central theme of plaintiffs' case in the underlying arbitration, the fact remains that plaintiffs' claims "were based on fraudulent omissions under the Alabama Securities Act and common law which induced Plaintiffs to buy shares of the RMK funds believing them to be bond funds suitable for retirees, when in fact the RMK funds were speculative investment funds." (Doc. 5, p. 3).  In other words, the introduction of mismanagement evidence at the arbitration does not, necessarily, transform plaintiffs' claims into derivative ones.

The determination of whether a claim is derivative, or one that can be brought individually in a direct action, is informed by considerations of whether the alleged injury is distinct to the individual shareholder.  Recently, the Alabama Supreme court reiterated the difference between derivative and individual claims under Alabama law:

> 'As explained in *Galbreath* [*v. Scott,* 433 So.2d 454 (Ala.1983),] the primary difference between derivative and individual claims is one of standing, and standing is determined by the directness of the injury. If the wrong directly damages the corporation and its assets from waste, conversion and intentional mismanagement, the claim is the corporation's. *Hardy v. Hardy,* 507 So.2d 409 (Ala.1987); *Shelton v. Thompson,* 544 So.2d 845 (Ala.1989). A consequential decrease in the value of the shareholder's shares does not vest in him an individual claim. *Green v. Bradley Construction, Inc.,* 431 So.2d 1226 (Ala.1983); *Stevens v. Lowder,* 643 F.2d 1078 (5th Cir.1981). But if the wrong is committed directly against the shareholder and his interests, such as oppression or fraud, so that his injury is unique, he will have standing to assert individual claims. *McDonald v. U.S. Die Casting & Dev. Co.,* [541] So. 2d 1064 (Ala.1989).'

15

Altrust Financial Services, Inc. v. Adams, 76 So. 3d 228, 241-42 (Ala. 2011), citing Gilland v.

USCO Power Equipment Corp., 631 So. 2d 938, 940 (Ala. 1994) (quoting Andrew P. Campbell,

Litigating Minority Shareholder Rights and the New Tort of Oppression, 53 ALA. LAW. 108, 114

(March 1992)).[13]   In this case, there are aspects of the plaintiffs' claims that exhibit tendencies of

both derivative and direct actions; as such, the court does not underestimate the difficulty in pleading

a direct shareholder claim, nor does the court fault the defendant for arguing that the plaintiffs'

claims are derivative.  But, in a case where judicial review is so circumscribed that it is "among the

narrowest known to the law," the court cannot grant vacatur by indulging a close-call:

> That aside, expanding the detailed categories would rub too much
> against the grain of the § 9 language, where provision for judicial
> confirmation carries no hint of flexibility. On application for an order
> confirming the arbitration award, the court "must grant" the order
> "unless the award is vacated, modified, or corrected as prescribed in
> sections 10 and 11 of this title." There is nothing malleable about
> "must grant," which unequivocally tells courts to grant confirmation
> in all cases, except when one of the "prescribed" exceptions applies.

Hall St. Associates, L.L.C. v. Mattel, Inc., 552 U.S. 576, 587, 128 S. Ct. 1396, 1405, 170 L. Ed. 2d

254 (2008).  With "no hint of flexibility," the court must confirm the award in this case unless the

record substantiates that the arbitrators exceeded their power in presiding, as the defendant argues,

---

[13]The court notes that "[i]n a diversity action, the determination [of whether a claim is direct
or derivative] will be made under state law; in suits in which the rights being sued upon stem from
federal law, federal law will control the issue whether the action is derivative." Medkser v. Feingold,
307 F. App'x 262, 264 (11th Cir. 2008), citing 7C Wright, Miller & Kane, Federal Practice and
Procedure, § 1821 (3d ed.2007).

over derivative claims.  As mentioned above, the court is unconvinced that the plaintiffs' claims were transformed into derivative ones by the introduction of mismanagement evidence.  Likewise, the court is unwilling to categorically construe plaintiffs' claims as derivative claims when the record evinces that, at the least, it would be reasonable for the arbitrators to consider the plaintiffs' claims as direct ones.

Several procedural matters in the arbitration proceeding itself suggests that the defendant viewed the plaintiffs as direct claims, not derivative one.  Before the two-week evidentiary hearing in the underlying arbitration began, the defendant filed a motion to sever the plaintiffs' claims "based on the seven <u>distinct</u> sets of Morgan Keegan financial advisors who serviced the particular Claimants' accounts."  (Doc. 3-2, p. 1) (emphasis added).  The motion to sever set forth that "evaluating each Claimants' case requires the Panel to focus on the relationship between Claimant and financial advisor."  (Doc. 3-2, p. 2).  Further, the defendant urged the panel to sever the plaintiffs' claims on grounds that the joinder standard had not been met.  In making this joinder argument, the defendant stated:

> That these Claimants invested in the same or similar funds with the same brokerage firm, and are pursuing identical legal claims, is not sufficient to amount to "questions" of fact or law to justify joinder. *See Ex parte Novartis Pharmaceuticals Corp.*, 2008 WL 1759109, *8 (Ala. 2008) (quotations and citation omitted) ("[T]he mere fact that two cases assert similar [or the same] theories of recovery does not constitute a common question of law so as to warrant consolidation,"); *see also Papagiannis v. Pontikis*, 108 F.R.D. 177, 178 (N.D. Ill. 1985) (holding that consolidation should not be allowed when complaint did not provide any link between plaintiffs or alleged representations made to each.).  In this case, the questions of fact that must be answered are almost entirely individual ones . . . These individual fact questions (among others), which go to the heart of each Claimant's burden of proof on each claim (including, for example, reliance, causation, and

> damages) as well as Morgan Keegan's affirmative defenses, cannot be
> handled in bulk.  Investors do not act in monolithic fashion; their
> choices, decisions, and motives are as individual in the investment
> context as in any other.

(Doc. 3-2, pp. 4-5).  Also, the defendant argued that the plaintiffs' claims were "due to be severed

for the additional reason that they simply do not arise out of the 'same' transaction or occurrence,

or series of transactions or occurrences."  (Doc. 3-2, pp. 2-3).  In emphasizing the uniqueness and

individuality of the plaintiffs' claims, and urging the arbitrators to focus on the distinct relationship

between individual plaintiff and broker, the motion to sever does nothing to dispel the proposition

that the plaintiffs' injuries were unique and therefore indicative of direct claims.  Certainly, the

motion to sever was not meant as a concession regarding the nature of the plaintiffs' claims, and the

court is not inclined to construe it beyond its intended reach or context; but, neither is the court

willing to conclude that the arbitrators exceeded their authority by hearing allegedly derivative

claims when those same claims have been described by the defendant as individual and distinct in

relation to causation and damages.

In addition to the motion to sever, a motion *in limine* to exclude "regulatory evidence and

other evidence pertaining to certain non-parties" was filed before the final hearing.  (Doc. 8-14, Exh.

D).  In that motion, it was argued that any evidence regarding the mismanagement of funds should

be excluded on grounds that such evidence pertains to derivative claims that the arbitrators were

prohibited from hearing under FINRA Rule 12205 — the rule which states that shareholder

derivative actions may not be arbitrated under the FINRA Code.  Essentially, the defendant asserted

the same derivative claim argument in its motion *in limine* that it raises now as grounds for vacatur.

While the motion *in limine* establishes that the defendant has not, after losing at arbitration, asserted

this derivative claim argument for the first time, it does not validate the position as a compelling ground for vacatur either. Primarily, this is due to the fact that the panel of arbitrators deemed the motion moot when it was not pursued at the final hearing.[14] To the extent that the defendant "did not pursue" an argument that plaintiffs' claims were derivative at the underlying arbitration, the court is unwilling, in hindsight, to find that the arbitrators exceeded their authority in hearing those claims.

Taken together, the plaintiffs' statement of the claim and the defendant's pre-hearing motions (motion to sever and motion in limine) can be construed as evincing that not only are the plaintiffs' claims are direct as opposed to derivative claims, the defendant urged that position as well in the arbitration. On the other hand, there are aspects of the plaintiffs' claims that make the derivative claim argument at least plausible. The fact that an argument can be made on either side of the direct/derivative claim issue underscores the inherent difficulty of determining the nature of the plaintiffs' claims at this juncture. To say now that the plaintiffs' claims are derivative in nature, when there was evidence before the arbitrators that the claims were direct, is not a supposition that the court is willing to accept as a viable ground for vacating the arbitration award here. This is especially true given that the award may well have been rendered by the panel on the basis of the direct evidence of alleged misrepresentations (in the form of the individual plaintiffs testifying at the evidentiary hearing), instead of evidence regarding fund mismanagement.

---

[14]To be precise, the Final Award recites that "On or about December 20, 2011, Respondent filed a Motion in Limine to Exclude Regulatory and Other Evidence Pertaining to Certain Non-Parties asserting, among other things, that Claimants should be precluded from presenting irrelevant evidence at the final hearing related to regulatory matters and any alleged mismanagement of the RMK Funds by the Fund's Investment advisor and portfolio manager. . . .The panel deferred ruling on the motion until the final hearings. During the final hearings, Respondent did not pursue its motion and the Panel deemed the motion moot." (Doc. 3-7, Exh. G, p. 5).

Even if the court did apprehend the nature of the plaintiffs' claims as more derivative than direct, it cannot vacate the award unless the arbitrators exceeded their power in hearing those claims and that raises the question of whether violating an internal FINRA prohibition against hearing shareholder derivative claims constitutes an excess of power as contemplated under 9 U.S.C. § 10(a)(4).  The defendant cites  Morgan Keegan & Co. v. Garrett, 816 F.Supp. 2d 439 (S.D. Tex. 2011), and two Alabama Supreme Court cases, In re Grantland Rice, II, 67 So. 3d 45 (Ala. 2010) and Ex parte Morgan Asset Management, Inc., No. 1100714, 2011 WL 3963004 (Ala. Sept. 9, 2011), as authority for their position vacatur is warranted, and the court addresses these decisions in turn.

In Morgan Keegan & Co. v. Garrett, the court vacated an arbitration award entered against Morgan Keegan in a FINRA arbitration that involved facts similar to those alleged in this case; namely, that the plaintiff-investors were misled into investing in certain bond funds.  After a six-day arbitration hearing, a  FINRA arbitration panel awarded $9.185 million to the plaintiff-investors. In moving to vacate the award, the defendant made three primary arguments: (1) the arbitrators exceeded their power by hearing the claims of two plaintiffs who were not Morgan Keegan customers, having bought shares from a third-party broker; (2) the arbitrators exceeded their power in hearing derivative claims; and (3) the award was based on "knowingly false testimony" and, therefore, must be vacated.  Garrett, 816 F.Supp. 2d at 441-442.  The court vacated the award on the basis of all three grounds.  Id. at 442.  Regarding the derivative claim argument for vacatur, the court surmised that:

> Here, the claimants sued for fraud and said Morgan Keegan intentionally lied about the fund's value.  The only evidence they offered was a technical witness who said the funds lost more value than the average fund when the market crashed.  That proves nothing.

> Inevitably some funds will be above or below average.  It does not
> mean there was fraud.
>
> The real complaint is that they did not like how the funds were
> invested or the internal pricing of the funds.  The claimants thought
> that Morgan Keegan mismanaged the fund, causing the fund to lose
> value.  They sued because they lost money.  It is a textbook derivative
> claim.

Id. In the instant matter, as already discussed, a number of plaintiffs testified at the evidentiary

hearing regarding representations that were made to them about the RMK funds and their alleged

injuries from investing in those funds.  While there was testimony also concerning the alleged

mismanagement of the funds, this court does not read the transcript to *only* offer mismanagement

evidence, as the Garrett court concluded under the facts of that case.  Further, an important

distinction in Garret, that does not exist here, involves fraudulent testimony, or, as the court

described it, "technical lies."  Id.  In Garrett, a witness whose "testimony was key to [the] claimants'

success" at arbitration, admitted (after arbitration) that he testified falsely regarding the claimants'

losses.  Id.  The false testimony was the "only technical financial evidence" at the arbitration and,

consequently, the Garrett court concluded that the "panel's reliance on McCann's testimony

vitiate[d] the award."  Id.  Thus, the  court decided that "[e]ven if the panel had power to hear the

claims, the award would still have been vacated because it was based on fraudulent testimony."  Id.

In this case, the court perceives the "real complaint" as more than mere dissatisfaction with

how the RMK funds were invested and managed.  There is enough in the plaintiffs' statement of the

claim and the testimony of individual plaintiffs at the evidentiary hearing to convince the court that

the real complaint in this case concerned misrepresentations (what they were told or not told about

the risk of the RMK funds) and the investment of money in a high-risk sector when conservative

investments were sought.  This is different from how the court construed the plaintiffs' claims in

Garrett.  Further, the procedural underpinnings of Garrett are distinct from this case – in Garrett,

Morgan Keegan moved to dismiss all claims on grounds that the claims were not arbitrable; here,

any argument that the plaintiffs' claims were derivative and not arbitrable was not pursued and

deemed "moot" by the panel, only to be pursued now, after an award has been entered.  The

differences between Garrett and this case outnumber the similarities and, consequently, the court is

not apt to deduce here that the plaintiffs' claims are "textbook derivative" so as to warrant, without

more, a vacatur of the arbitration award.

The defendant cites Ex parte Regions Financial Corp., (In re Grantland Rice, II), 67 So. 3d

45 (Ala. 2010)  and  Ex parte Morgan Asset Management, Inc., (In re Reed), 86 So. 3d 309 (Ala.

2011), as additional authority in support of its vacatur argument.  Like the instant matter, these cases

involved litigation over RMK funds.  In both cases, the defendants moved the trial court to dismiss

the litigation against them on grounds that the claims were derivative in nature and could be asserted

only in compliance with Rule 23.1 of the Alabama Rules of Civil Procedure, which governs

derivative actions by shareholders under Alabama law.  Specifically, the defendants argued that the

plaintiffs failed to comply with the requirements of Rule 23.1, which resulted in a lack of standing

and, concomitantly, a lack of subject-matter jurisdiction.  In each case, the Jefferson County Circuit

Court denied the motions to dismiss and the defendants petitioned, respectively, the Alabama

Supreme Court for writs of mandamus directing the trial court to dismiss the claims against them.

Because the linchpin of the defendants' argument for dismissal was the contention that the plaintiffs'

claims were derivative in nature, that issue was the central determination to be decided on mandamus

review.  Ultimately, the court agreed with the defendants and held that the plaintiffs' claims were

derivative under Maryland law, the jurisdiction where the RMK funds were incorporated.

In concluding that the plaintiffs' claims were derivative, the court abided by a principle under

Maryland law that provides:

> '[i]n deciding whether a shareholder may bring a direct suit, the
> question the Maryland courts ask is not whether the shareholder
> suffered injury; if a corporation is injured those who own the
> corporation are injured too.  The inquiry, instead, is whether the
> shareholders' injury is 'distinct' from that suffered by the
> corporation.'

In re Grantland Rice, II, 67 So. 3d at 50;  In re Reed, 86 So. 3d at 314-15 (internal citations omitted).

Applying this principle, the court in the Reed case concluded that, despite the "various theories"

under which the plaintiffs sought relief, their claims were, essentially, for injuries associated with

the "diminution in value of the RMK funds, which was a result of alleged mismanagement."  Id. at

317.  Therefore, the court decided that the plaintiffs had alleged an injury that "'falls directly on the

corporation as a whole and collectively, but only secondarily, upon its stockholders as a function and

in proportion to their pro rata investment in the corporation.'"  Id. (internal citations omitted).

Because the court construed the claims as derivative, and the plaintiffs did not comply with Rule

23.1, it held that the plaintiffs did not have standing and the trial court did not have subject-matter

jurisdiction over the claims.  Id. The court reached the same conclusion in the In re Grantland Rice

II case, holding that ". . . because the claims asserted by the shareholders are properly viewed as

derivative claims, and because the shareholders did not comply with the requirements of Rule 23.1

for asserting such claims, the shareholders lack standing." In re Grantland Rice, II, 67 So. 3d at 56.

Again, the court is not dismissive of the defendant's position and views the <u>Reed</u> and <u>Rice</u> cases as making the direct/derivative claim determination, at the least, a close-call.  The procedural posture of the instant action, as compared to the mandamus review of a motion to dismiss, cannot be underestimated, however, and it is a key distinction that the court recognizes also.  Here, the court is restricted to a severely circumscribed review where a statutory directive unambiguously instructs that confirmation of the award must be granted unless a limited exception comes into play.  Indeed, the exception that the defendant attempts to invoke (§ 10(a)(4)) is applicable only in the most narrow of circumstances:

> It is not enough for petitioners to show that the panel committed an error—or even a serious error. See *Eastern Associated Coal Corp. v. Mine Workers,* 531 U.S. 57, 62, 121 S.Ct. 462, 148 L.Ed.2d 354 (2000); *Paperworkers v. Misco, Inc.,* 484 U.S. 29, 38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). "It is only when [an] arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice' that his decision may be unenforceable." *Major League Baseball Players Assn. v. Garvey,* 532 U.S. 504, 509, 1015, 121 S.Ct. 1724, 149 L.Ed.2d 740 (2001) *(per curiam)* (quoting *Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)). In that situation, an arbitration decision may be vacated under § 10(a)(4) of the FAA on the ground that the arbitrator "exceeded [his] powers," for the task of an arbitrator is to interpret and enforce a contract, not to make public policy.

<u>Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.</u>, ___ U.S. ___, 130 S. Ct. 1758, 1767, 176 L. Ed. 2d 605 (2010).  By contrast, in the cases cited by the defendant, the appellate court was reviewing the propriety of subject-matter jurisdiction and was not encumbered by considerations inherent to falling within a very narrow and limited, statutory exception.  Further, noncompliance with Alabama Rule

of Civil Procedure 23.1, which is not at issue in this case, implicates standing and the question of whether the plaintiffs could commence the litigation at all.   The arbitration here, however, was commenced and litigated to conclusion, with an award being entered following a  two-week evidentiary hearing; and, this happened without any sustained effort to dismiss or prevent the arbitration proceedings on grounds that the plaintiffs' claims were derivative and, as such, could not be arbitrated under FINRA rules.[15]   Cf. Morgan Keegan & Co. v. Shadburn, 829 F.Supp. 2d 1141 (M.D. Ala. 2011) (where Morgan Keegan moved for and was granted a preliminary injunction to enjoin an arbitration on grounds that the defendant was a "non-customer" and therefore arbitration would violate FINRA Rule 12220).  This distinction hinders the defendant in making a persuasive analogy between this case and the Reed and Rice matters and, more significantly, underscores the reality here – that the procedural posture of this case posits very little discretion in the court to do anything other than confirm the award.[16]

---

[15]Again, the court notes that the defendant raised the derivative claim argument in a motion *in limine* that was filed advance of the arbitration proceeding but that motion was not pursued and the Panel "deemed the motion moot."  (Doc. 3-7, Exh. G, p. 5).

[16]As explained above, there are aspects of the plaintiffs' claims that the court finds indicative of direct claims and, on balance, these aspects weigh more in favor of a determination that the plaintiffs claims are direct, not derivative ones.  Even if the court did view the plaintiffs' claims as derivative, however, the award should be vacated only if violation of a FINRA rule constitutes an excess of power as contemplated under 9 U.S.C. §10(a)(4), and that is not a conclusion that this court is ready to make under the facts of this case.   Moreover, the court is not convinced that an individual investor should be denied the ability to file an individual claim for misrepresentation (in connection with purchasing a security) on grounds that there is no distinct injury because the fund was mismanaged and the loss, of which the aggrieved investor complains, was an injury to the fund that concomitantly affected all shareholders.  In this regard, the court notes Justice Murdock's dissent in the Reed case:

> There is a clear difference between the claim of a prospective investor misled into investing in a fund by the fraudulent advice of an

### *Failure to Enforce Discovery Rules*

In addition to the derivative claim argument for vacatur, the defendant makes an argument that the Panel failed to enforce FINRA's rules concerning discovery and, therefore, the award should be vacated. As an example of the alleged failure to enforce discovery rules, the defendant cites to a "glaring illustration," namely, the failure of one plaintiff to produce her tax returns until "the morning she actually took the stand and testified." (Doc. 8, p. 13). Tax returns, the defendant argues, are part of the initial mandatory document production and were among the documents requested in the defendant's motion to compel, which the Panel granted. Thus, the failure of the Panel to enforce its motion to compel and abide by FINRA discovery rules constitutes, according to the defendant, an excess of power that requires the award to be vacated.

---

> investment advisor and a claim by a 'shareholder' who never received fraudulent investment advice but who nonetheless eventually suffered a loss when a fund manager subsequently mismanages a fund. . . .That is, the direct claim asserted by the sisters [plaintiffs] is not one complaining of the concealment of alleged *mismanagement* of the RMK funds. Instead, the sisters [plaintiffs] are seeking damages for fraud based on alleged misrepresentations as to the nature of the securities in which the funds already were and would remain invested, fraud that allegedly induced the trusts established for the benefit of the sisters [plaintiffs] to be 'shareholders' in the RMK fund when they otherwise would not have been. Thus, as noted, although the sisters [plaintiffs] losses eventually might have been experienced at the same time and perhaps even in the same measure as the losses suffered by investors who were injured solely as a result of the defendants' eventual mismanagement of the RMK funds, they are nonetheless, in the contemplation of the law, a different injury resulting from a distinctly different cause of action.

In re Reed, 86 So. 3d at 322, 324 (Ala. 2001) (Murdock, J. dissenting).

Again, the court must confirm the arbitration award here unless statutory exception exempts application of the general rule requiring confirmation.  The defendant urges that the arbitrators exceeded their powers in failing "to punish the plaintiffs for their delay in compliance."  (Doc. 8, p. 14).  The court construes the defendant's argument as invoking 9 U.S.C. § 10(a)(4).  The defendant has cited no authority, and the court is not aware of any, where a failure to enforce a motion to compel or abide by a FINRA discovery rule constitutes a basis to vacate an arbitration award under 9 U.S.C. § 10(a)(4).  See Stone v. Bear, Stearns & Co., 2012 WL 1946938, No.2:11-cv-5118, at *16 (E.D. Pa. May 29, 2012) ("To hold otherwise would risk turning every minor violation of FINRA rules, even unknown by FINRA at the time of the arbitration, into grounds for vacatur. This would run counter to the policy in this country favoring the finality of arbitration awards, as well as the Supreme Court's recent admonitions in *Hall Street* that "exceed[ing] ... powers" in Section 10(a)(4) is a species of "extreme arbitral conduct," [citation omitted], and *Stolt–Nielsen* that Section 10(a)(4) attacks must fail unless the "arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice.'" (citation omitted)).  Accordingly, the court will not vacate the arbitration award here on grounds that the arbitrators exceeded their authority in allegedly violating a FINRA discovery rule.

### *Alleged Mistake in Damages Calculation*

The final argument that the defendant urges  is one for partial vacatur of plaintiff Sparks-Mitchell's award on grounds that the "Panel exceeded their powers in failing to follow their own damage formula." (Doc. 8, p. 14).  The gist of this argument is that the arbitrators awarded damages

to nine of the ten plaintiffs based on the same formula, but inexplicably used a different formula for calculating the damages of one plaintiff. Notably, the award itself does not indicate or describe any formula that the Panel used in calculating the damages; rather, it only recites the dollar amount awarded to each individual plaintiff. Based on the damages awarded, however, the defendant hypothesizes that the Panel awarded all plaintiffs 100% of their trading losses in the Intermediate Fund and exactly 50% of their trading losses in the other RMK funds at issue. So, the defendant has submitted what it believes to be the formula that the arbitrators used in calculating the damages, even though the award itself does not indicate as much.

In an effort to explain the different damage amount awarded to plaintiff Sparks-Mitchell, opposing counsel suggests that "[o]ne reason that the Panel may have used a different damage calculation for Bonnie Sparks-Mitchell on her suitability claim is that she had income of less than $25,000 and few assets so that the acts of the broker towards her were particularly egregious." (Doc. 5 at p. 15). Plaintiffs then cite Isenhower v. Morgan Keegan & Co., Inc., 311 F.Supp. 2d 1319 (M.D. Ala. 2004), for the following proposition:

> Despite seeking modification of the arbitration award, Plaintiffs make no argument that any of the three statutory bases for modification of the arbitration award exist. Indeed, the Court's own independent review of these bases for modification of the arbitration award compels the conclusion that the arguments advanced by Plaintiffs for modification of the arbitration award are simply not grounded in any recognized statutory basis for modification set forth in the FAA.

Isenhower, 311 F.Supp 2d at 1324. Thus, the plaintiffs conclude "there is no statutory basis for setting aside the Award here even if Morgan Keegan's argument that the Arbitrator's incorrectly applied damage formula usage is correct." (Doc. 5, p. 15).

Under 9 U.S.C. § 11, a court may modify an arbitration award under the following circumstances:

> (a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award.
>
> (b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted.
>
> (c) Where the award is imperfect in matter of form not affecting the merits of the controversy.

9 U.S.C. § 11. Accordingly, "[t]he order may modify and correct the award, so as to effect the intent thereof and promote justice between the parties." Id. The defendant's motion to vacate does not invoke any of the §11 statutory grounds for modification, rather it asserts that the arbitrators exceeded their power in their damages calculation of plaintiff Sparks-Mitchell's award. The court is unconvinced that the damages calculation, even if mistaken, is grounds for vacatur in this case when courts have held that "[c]ourts are generally prohibited from vacating an arbitration award on the basis of errors of law or interpretation, and the express terms of 9 U.S.C. §§ 10 and 11 have often been deemed the exclusive grounds for vacation or modification." Ainsworth v. Skurnick, 960 F.2d 939, 940 (11th Cir. 1992) (citations omitted). Even if the court construes the defendant's argument under 9 U.S.C. § 11(a), instead of an excessive power argument under 9 U.S.C. § 10(a)(4), there is still insufficient evidence of a material miscalculation that would compel the court to modify the award under the facts of this case. This is especially true in the absence of any explanation in the award itself regarding how the damages were actually calculated. See e.g., Fellus v. Sterne, Agee

& Leach, Inc., 783 F. Supp. 2d 612, 622 (S.D.N.Y. 2011) ("[the defendant] does not point to any patently obvious miscalculation on the face of the award, nor can it do so, for the award does not explain the arbitrators' rationale in reaching their decision or reference any numbers other than the total damages awarded.  Therefore, the arbitration award does not contain an evident material miscalculation warranting modification.").  The court is unwilling construe the award in this case as evincing a patently obvious miscalculation on the face of the award when the defendant has not argued as much and plaintiffs have offered an explanation for the difference in Sparks-Mitchell's award.  Accordingly, the court declines to vacate or modify the arbitration award of plaintiff Sparks-Mitchell.

## CONCLUSION

Consistent with the foregoing discussion of the evidence presented and law governing this action, this court determines that plaintiffs' application to confirm arbitration award (doc. 1) is due to be  GRANTED, and the defendant's motion to vacate arbitration award (doc. 3) is due to be DENIED.  An order granting the application to confirm arbitration award will be entered contemporaneously herewith.

DONE and ORDERED this the 28th  day of September, 2012.

T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE